**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

**UNITED STATES OF AMERICA,**

**Plaintiff,**

**v.**

**ADESH ALVIN BISSOON,**

**Defendant.**

**Case No. 1:20-CR-087(1)**

**Judge Cole**

**GOVERNMENT'S SENTENCING MEMORANDUM**

## INTRODUCTION

For nearly seven years, Adesh Bissoon supported himself entirely through an identity-theft scheme, causing a loss of at least $3.5 million dollars—including more than $1,000,000 in disaster-relief funds he fraudulently obtained during the COVID-19 pandemic. His scheme was sophisticated, involving hundreds of accounts opened in victims' names and in the names of LLCs he had created using their personally identifiable information (PII). And Bissoon was brazen: Even after being charged in this case, and in violation of his conditions of pretrial release, he continued to perpetrate the scheme, fraudulently seeking a $150,000 reimbursement for allegedly unauthorized transfers from his account, when in fact he had made the transfers himself—using another account he had opened in a victim's name.

As explained in more detail below, because of the many aggravating circumstances in this case, and because there are not significant mitigating factors, the government respectfully requests that the Court impose a Guidelines sentence: 78 months' imprisonment on Count 1, followed by the mandatory consecutive 24-month sentence on Count 4; two years of supervised release; and a $200 special assessment. The government further requests that the Court impose

a $150,000 fine, that Bisson be ordered to pay $3,591.32 in restitution to Barclays Bank DE, and that the Court set another hearing for approximately 30 days from sentencing at which the amount of restitution due to another victim may be determined.

## BACKGROUND

### A. Bissoon profited from an identity-theft scheme for years, causing multiple millions of dollars in loss.

In 2019, the U.S. Inspector General for Tax Administration began investigating defendant Adesh Bissoon for bank fraud, mail fraud, and identity theft after evidence showed he was exchanging stolen PII and fraudulent identity documents with coconspirators Victor Torres and Michael Joseph via email.

Further investigation showed that the conspiracy had been going on since at least November 2013—almost seven years—and shed light on the three coconspirators' roles. Joseph obtained stolen PII—including victims' names, addresses, Social Security numbers, and driver's license information—from the dark web[1] and then shared it with Bissoon and Torres. Torres used the stolen PII to create false identity documentation, including false Social Security cards, driver's licenses, paystubs, and checks, which he shared with Bissoon and Joseph. All three conspirators then used the stolen PII and fraudulent identity documents to open unauthorized financial accounts in victims' names. From there, the three coconspirators largely followed their own paths, with each seeing how much money he could make from the fraudulent accounts he created.

[1] The term "dark web" refers to encrypted online content that is not indexed by conventional search engines like Google. The dark web cannot be accessed via a standard browser such as Chrome; doing so requires custom software.

Of the three coconspirators, Bissoon was the most ambitious. Once he had opened a financial account in a particular victim's name, he profited by, among other things, making charges to credit cards in the victims' names and requesting convenience checks that allowed him to obtain cash advances via the victims' line of credit. For example, in 2019, Bissoon requested eight convenience checks, totaling $14,000, from an account in one victim's name. Bissoon also enriched himself by writing checks in victims' names, drawn from accounts he had opened in their names, and made payable to himself. In other words, Bissoon did not hack into victims' true bank accounts or make charges to their credit cards; he opened entirely new accounts in the victims' names, which the victims did not know about, and used multiple tools to convince financial institutions to give him money using the victims' lines of credit.

But it was not just personal accounts that Bissoon opened in the victims' names; he also created LLCs in the victims' names and then opened business credit cards in the names of the LLCs. The business accounts typically had higher credit limits than individual accounts, allowing Bissoon to request convenience checks in higher amounts, as well as to make larger charges on the credit cards. For example, in 2018 Bissoon opened a business credit card in the name of an LLC he had created using victim V.D.'s identity, and from June 2018 through March 2019 he made more than $60,000 in charges to the card, which he did not pay off.

Later in 2018, Bissoon deposited several more checks to an account in his name, drawn from an account he had opened in victim J.K.'s name. These checks totaled more than $50,000 and were drawn from TIAA Bank. Fidelity Investments later identified these checks as "altered/fictitious" and rejected them; however, by that time Bissoon had already transferred the money to another account he controlled.

Bissoon also enriched himself by falsely claiming to be a victim of fraud and requesting that the banks reimburse him for money he himself had stolen. For example, after Bissoon caused the above-described checks in J.K.'s name to be written to himself, he then used J.K.'s identity to file a fraud claim with TIAA Bank, asserting that the checks had not been authorized. In response, TIAA Bank shut down the account from which the checks had been withdrawn, opened a new account for "J.K.," and then refunded "J.K." the approximately $50,000 that Bissoon had stolen. Bissoon then transferred those funds to another financial account he had opened in the name of a different victim.

To help him keep track of the many victims whose PII he was using, as well as the many financial accounts he had opened in their names, Bissoon created Excel spreadsheets to stay organized. For example, one spreadsheet listed eight victims and the fraudulently opened accounts associated with each. Bissoon created approximately a dozen such spreadsheets and sent them to Joseph from October 2014 through January 2015. As Bissoon admitted in his plea agreement, he knew that the people whose PII was listed in the spreadsheets were real individuals.

Bissoon laundered proceeds of the scheme by purchasing and reselling precious metals. He also laundered proceeds by purchasing money orders from the U.S. Postal Service, which he then deposited into accounts he controlled. For example, from January 2015 through June 2019, an account in Bissoon's name received approximately 215 U.S. Postal Service money orders totaling more than $200,000.

### B. Bissoon also fraudulently obtained more than $1,000,000 from programs meant to assist Americans during the COVID-19 pandemic.

In addition to defrauding financial institutions and his fellow Americans, Bissoon defrauded the United States government. Specifically, during the COVID-19 pandemic,

Bissoon enriched himself by applying for Economic Impact Disaster Loans in the names of LLCs he had created using victims' PII. Bissoon also applied for an Economic Impact Disaster Loan and a Paycheck Protection Program loan in the name of an LLC he had opened using his own PII, but which he used in furtherance of the fraud. As a result, Bissoon was fraudulently awarded more than $1,000,000 in fraudulent loans. The government later recovered approximately $980,000 of what was disbursed.[2]

**C. A search of one of Bissoon's residences revealed evidence of a sophisticated scheme, and Bissoon admitted in an interview that he had stolen victims' identities.**

When federal agents executed a search warrant at one of Bissoon's residences in August 2020, they found multiple driver's licenses in other people's names, approximately 200 credit and/or debit cards in other people's names, and more than 10 checkbooks in other people's names. Agents also hundreds of other documents containing victims' PII; approximately $70,000 in United States currency; tens of thousands of dollars' worth of precious metals; and seven cellphones, each of which was labeled with the name of a victim.

In an interview that same day, Bissoon admitted that he and his coconspirators had access to "underground information" comprising lists of individuals' PII and that he used this information to open accounts without the victims' authorization. He also explained that he laundered funds for Joseph, keeping a 20% cut. Bissoon said that, to help him receive mail in the victims' names, he made copies of mailbox keys he found in his apartment building's mailroom and used those neighbors' addresses on some of the fraudulent accounts. When he started missing mail that way, he transitioned to mail-repackaging services like

[2] As discussed below, the government requests that the Court set a hearing approximately 30 days after the sentencing hearing at which the total amount of restitution owed to the Small Business Administration may be determined.

PhysicalAddress.com instead, signing up for accounts using driver's licenses in other people's names.

**D. After his arrest and release on bond, Bissoon continued to perpetrate the identity-theft scheme—bringing the total intended loss from the scheme to at least $3.5 million.**

Even after his arrest in this case, Bissoon continued to engage in bank fraud. On August 14, 2020, he was released on bond with the condition that he "not commit a Federal, State, or local crime" (a mandatory condition in every case, *see* 18 U.S.C. § 3142(b)), as well as the special condition that he have "no access to credit cards / debit cards [or] PII of others":

Travel extended to:
Other: at address on Bond.
Time from today to
from Speedy Trial Clock
NEXT COURT APPEARANCE Date: NO Time: Judge: Place:
Report RE Counsel: credit cards / debit cards
PTD/Bond Hearing: PPI of others.
Prelim/Arraign or Removal:

(Doc. 4 at 20 (Minute Order)).

Despite these express orders, on August 16, 2020, the same day Bissoon met with Pretrial Services and signed paperwork acknowledging that he understood the conditions of release, he contacted Rising Bank, where he had a checking account that he had not disclosed to Pretrial Services, and falsely reported that someone had made sixteen unauthorized transactions transferring more than $150,000 out of his account. Bissoon asked the bank to "[p]lease look into these unauthorized transactions" and asked, "How and when will I be made whole again?"

When speaking to a bank representative, Bissoon claimed he did not know J.K.—even though materials in J.K.'s name had just been found in his house—and maintained that the transactions were unauthorized. The representative requested that Bissoon complete an ACH

dispute form for each of the unauthorized transactions and submit a police report substantiating the fraud. On August 20, 2020, Bissoon filed a false police report with Port St. Lucie Police Department claiming that he had not authorized the transactions. He later submitted the police report to the bank in support of his request for reimbursement of the purportedly unauthorized transactions.

As Bissoon admitted in his plea agreement, and contrary to his representations to the bank and his assertions in his police report, he himself had made the allegedly unauthorized debits from the Rising Bank account using an account he had opened in the J.K.'s name.

As Bissoon also admitted in his plea agreement, the total intended loss to his victims, including the banks and the U.S. government, was at least $3.5 million.

## APPLICABLE LAW

The Sentencing Guidelines "should be the starting point and the initial benchmark for choosing a defendant's sentence." *United States v. Demma*, 948 F.3d 722, 727 (6th Cir. 2020) (internal quotations omitted). Accordingly, "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *Gall v. United States*, 552 U.S. 38, 49 (2007). Then, "the district court must weigh and apply the range of factors outlined in 18 U.S.C. § 3553(a)." *Id.* at 49-50. These include (1) the nature and circumstances of the offense and the history and characteristics of the defendant and (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; to afford adequate deterrence to criminal conduct; to protect the public from further crimes of the defendant; and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. 18 U.S.C. § 3553(a). The Court should impose a sentence sufficient but

not greater than necessary to reflect the purposes of sentencing that Congress identified in 18 U.S.C. § 3553(a)(2). *See* 18 U.S.C. § 3553(a).

## ARGUMENT

### A. The PSR correctly calculates the Guidelines.

#### 1. Summary of Guidelines Ranges and Statutory Minimum Sentence

The probation officer correctly calculated the Guidelines in this case, which result in a Guidelines range of 78 to 97 months' imprisonment on Count 1, plus an additional two-year mandatory sentence on Count 4, which by statute must run consecutively to the sentence imposed on Count 1. (PSR ¶¶ 144-46.)

The Guidelines also recommend a term of supervised release of between two and five years on Count 1, and up to one year on Count 4, with any terms of supervised release to run concurrently. (*Id.* ¶ 1449-50.) There is no statutory minimum term of supervised release, and multiple terms of supervised release will run concurrently. (*Id.* ¶ 148.)

The Guidelines recommend a fine of between $25,000 and $1,000,000. (PSR ¶ 155.) And a special assessment of $100 per count is mandatory. (*Id.* ¶ 154.)

Restitution to victims is also mandatory under 18 U.S.C. § 3663A. (PSR ¶ 158.)

#### 2. The two-level enhancement in § 2B1.1(b)(9)(C) applies to Bissoon's conduct.

The defense objects to the probation officer's application of a two-level enhancement under § 2B1.1(b)(9)(C). As explained below, the probation officer correctly applied the enhancement.

**(i) Applicable Guideline and Commentary**

Section 2B1.1(b)(9)(C) provides for a two-level enhancement "[i]f the offense involved . . . (C) a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines[.]"

The commentary to this provision provides further details about the circumstances in which the enhancement applies:

> (C) Fraud in Contravention of Prior Judicial Order.—Subsection (b)(9)(C) provides an enhancement if the defendant commits a fraud in contravention of a prior, official judicial or administrative warning, in the form of an order, injunction, decree, or process, to take or not to take a specified action. A defendant who does not comply with such a prior, official judicial or administrative warning demonstrates aggravated criminal intent and deserves additional punishment. . . . . This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (e.g., a violation of a condition of release addressed in § 3C1.3 (Commission of Offense While on Release) or a violation of probation addressed in § 4A1.1 (Criminal History Category)).

U.S.S.G. § 2B1.1 – Cmt. to § 2B1.1(b)(2) (emphases added).

**(ii) Bissoon violated a "prior" court order, because the offense of conviction continued after the bond order was issued.**

Bissoon first argues that an enhancement under § 2B1.1(b)(9)(C) does not apply here because Bissoon violated a "condition of release" and, according to him, the conditions of release are not a "prior" order because they "do not predate the commission of the offense in this case." (Obj. Ltr. at 1.)

Bissoon is mistaken. Unfortunately, the offense did not stop when Bissoon was originally arrested, or even when he was released on bond; Bissoon continued committing the same offense—a fraud scheme involving, among other crimes, identity theft, bank fraud, and wire fraud—after the Magistrate Judge issued a bond order.

For purposes of the Guidelines, the "offense" is not determined rigidly according to the dates in the indictment or the date of a defendant's arrest, or even the charges to which the defendant pleads guilty. Rather, where counts would group under § 3D1.2(d), the term "offense" includes all acts that were part of the same course of conduct or scheme as the offense of conviction. As explained in § 1B1.3 (Relevant Conduct), "specific offense characteristics"—such as the applicability of § 2B1.1(b)(9)(C)—shall be determined on the basis of," among other things:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded, induced, procured, or willfully caused by the defendant;
> . . . .
> (2) solely with respect to offenses of a character for which §3D1.2(d) would require grouping of multiple counts, all acts and omissions described in subdivisions (1)(A) and (1)(B) above that were part of the same course of conduct or common scheme or plan as the offense of conviction;

The commentary to Subsection (a)(2) further explains, "Application of this provision does not require the defendant, in fact, to have been convicted of multiple counts."

The offense Bissoon committed on August 16, 2020, when he falsely represented to the bank that "J.K." had defrauded him, was part of the same course of conduct or scheme as the offenses of conviction, because it followed the same modus operandi and even involved one of the same victims as the offenses of conviction. *See* Cmt. to U.S.S.G. § 1B1.3(a)(2).

For purposes of determining relevant conduct under the Guidelines, therefore, Bissoon's "offense" was committed even after Bissoon was ordered released on conditions, and his continued commission of that offense was therefore in violation of a "prior" specific court order.

**(iii) Bissoon's violations of the bond order are not "addressed elsewhere in the Guidelines," because § 3C1.3 is directed only to cases in which a statutory enhancement under 18 U.S.C. § 3147 applies.**

Bissoon next argues that the enhancement should not apply because, in his view, § 2B1.1(b)(9)(C) applies "only when the conduct giving rise to the enhancement is not covered somewhere else in the Guidelines." (Obj. Ltr. at 3.) Bissoon argues that, because "a violation of a condition of release is covered elsewhere in the Guidelines, specifically in § 3C1.3," a violation of a condition of release allegedly cannot be the basis of an enhancement under § 2B1.1(b)(9)(C). (*Id.*)

Bisson's argument lacks merit. Section 3C1.3 is not relevant here, because the government did not bring a separate charge against Bissoon for the crimes he committed while on release, nor did the government advocate for an enhancement under 18 U.S.C. § 3147. Therefore, Bissoon's continued commission of the offense in violation of the bond order is not "addressed elsewhere in the Guidelines."

The commentary to § 2B1.1(b)(9)(C) supports this interpretation, making clear that the Commission expected the 2-level enhancement under § 2B1.1(b)(9)(C) to apply where, as here, the defendant was not already receiving an enhancement based on a violation of the same order:

> This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (e.g., a violation of a condition of release addressed in §3C1.3 (Commission of Offense While on Release) or a violation of probation addressed in §4A1.1 (Criminal History Category)).

§ 2B1.1(b)(9)(C) – App. n. 8 (emphases added).

Note that the focus is on whether the same conduct actually "resulted in an enhancement" under another Guideline and that the Commission specifically gave "a violation of a condition of release" as something that would warrant a 2-level enhancement under

§ 2B1.1(b)(9)(C) assuming that the defendant had not already received a 3-level enhancement under § 3C1.3.

**(iv) The Commission's commentary is not "plainly erroneous or inconsistent with" the Guideline.**

Bissoon next argues that the government and the probation officer's interpretation of the commentary to § 2B1.1 is "inconsistent with the actual language of § 2B1.1(b)(9)(C)" and that, under *United States v. Havis*, 927 F.3d 382, 386 (6th Cir. 2019), it therefore cannot stand. (Obj. Ltr. at 4.)

Bissoon is mistaken. In *Havis*, the Sixth Circuit held that a court "need not accept an interpretation [by the Sentencing Commission] that is plainly erroneous or inconsistent with the corresponding guideline." 927 F.3d at 386 (internal quotations omitted). At issue in that case was Application Note 1 to § 4B1.2, which added attempt crimes to the list of controlled substance offenses under § 4B1.2(b). *Id.* The Sixth Circuit held that the Application Note was not an "interpretation" at all; it was a wholesale addition of an offense that was not listed in the Guideline. *Id.* And because the text of § 4B1.2(b) "makes clear that attempt crimes do not qualify as controlled substance offenses," the Commission's decision to add attempt crimes to the definition of "controlled substance offense" deserved no deference. *Id.* at 387.

Here, the commentary to § 2B1.1(b)(9)(C) is not a "plainly erroneous" interpretation of the Guideline. The Guideline provides for an enhancement if the offense involved "a violation of any prior, specific judicial or administrative order, injunction, decree, or process not addressed elsewhere in the guidelines[.]" It is not plainly erroneous or inconsistent with any other part of the Guideline for the commentary to interpret this phrase as referring to a "violation . . . not addressed elsewhere in the Guidelines" (rather than a "topic" not so addressed)—and, accordingly, to explain that the enhancement does not apply if the same

conduct "resulted in an enhancement pursuant to a provision found elsewhere in the guidelines." § 2B1.1(b)(9)(C) – App. n. 8 (emphasis added). Indeed, this interpretation is consistent with the Guidelines' general policy of avoiding applying two enhancements for the same conduct. *See, e.g.*, U.S.S.G. § 2B1.6 (providing that, as applicable here, if a defendant is sentenced for Aggravated Identity Theft and another underlying offense, the enhancement under § 2B1.1(b)(11) for the transfer, possession, or use of a means of identification should not be applied when calculating the Guidelines range for the underlying offense). And, as explained above, the particular violations at issue here—Bissoon's continued commission of the crime of conviction, including by accessing credit cards and others' PII, in contravention of the bond order—are not addressed elsewhere in the Guidelines, because § 3C1.3 only addresses the circumstance in which a statutory enhancement under § 3147 applies, which it does not here.

**(v) The only case Bissoon cites that supports a contrary interpretation is a 30-year-old, out-of-circuit decision that predates relevant commentary from the Commission.**

Bissoon cites several case law summaries from Westlaw in support of his contention that the enhancement should not apply. In fact, in almost all of those cases, the court held that the enhancement did apply; they did not appear to address, even in dicta, any argument that a violation of a bond order could not be the basis of an enhancement under § 2B1.1(b)(9)(C).

Only one case, *United States v. Scarano*, 975 F.2d 580, 583 (9th Cir. 1992), *as amended* (Nov. 24, 1992), supports Bissoon's argument. But, aside from being an out-of-circuit, pre-*Booker* decision that is nearly thirty years old, its reasoning is unpersuasive, it predates the publication of the Guidelines commentary at issue here, and it is distinguishable on the facts.

In *Scarano*, the Ninth Circuit reasoned that it would not be appropriate to add a two-level enhancement for violating a "general bail order" for two reasons: First, because, in that court's view, there was no principled reason for enhancing the offense level of a fraud defendant but not of defendants subject to other guidelines; and second, because the court believed that a contrary interpretation would render other guidelines superfluous. 975 F.2d at 583.

Neither of these arguments is persuasive. First, there is a principled reason why Congress may have chosen this enhancement to apply to only fraud defendants who continue to offend on release. Fraud crimes necessarily involve dishonesty, so Congress may have believed that there was a particularly high risk that fraud defendants would think themselves clever enough (as did Bissoon here) to mislead a Pretrial Service Officer, as well as the Court, and to go on offending in contravention of a court order—including an order governing their behavior while on release.

Second, the *Scarano* court believed that interpreting § 2B1.1(b)(9)(C) to encompass committing crimes in violation of a bond order would render superfluous § 2J1.7, the predecessor to § 3C1.3—but, as explained above, those provisions apply to separate circumstances, with § 3C1.3 applying only where a defendant is subject to the statutory enhancement under 18 U.S.C. § 3147, and § 2B1.1(b)(9)(C) applying to violations that are not subject to § 3147.

The *Scarano* court also cited § 4A1.3(d), which provides that the court may vary upward if the defendant was "was pending trial or sentencing on another charge at the time of the instant offense." But this provision would not render § 2B1.1(b)(9)(C) superfluous, because

it applies only if the defendant was pending trial on "another charge"—i.e., in a separate case—at the time of the offense.

Importantly, *Scarano* predates the commentary to § 2B1.1(b)(9)(C) that informs the correct interpretation. In 1992, when *Scarano* was decided, the commentary to § 2F1.1 (the predecessor to § 2B1.1) did not contain the following language:

> This enhancement does not apply if the same conduct resulted in an enhancement pursuant to a provision found elsewhere in the guidelines (e.g., a violation of a condition of release addressed in § 3C1.3 (Commission of Offense While on Release) or a violation of probation addressed in § 4A1.1 (Criminal History Category)).

§ 2B1.1(b)(9)(C) – App. n. 8 (emphases added); *cf.* U.S.S.G. § 2F1.1 (1992) (lacking this language). Had the *Scarano* court had the guidance of this language, which cites in particular "a violation of a condition of release" as something that might trigger the enhancement, it likely would have come to the opposite conclusion.

For all of the foregoing reasons, the probation officer correctly applied an enhancement under § 2B1.1(b)(9)(C).

**B. A consideration of the § 3553(a) factors shows that a low-end Guidelines sentence of 78 months on Count 1, followed by a mandatory 24-month sentence on Court 4, is appropriate here.**

The nature and circumstances of this offense weigh in favor of a lengthy period of incarceration and at least two years of supervised release. Bissoon spent nearly seven years supporting himself through fraud, causing at least $3.5 million dollars in loss. He used stolen PII to open hundreds of financial accounts in at least dozens of victims' names, such that agents found in his home more than 200 unauthorized credit and debit cards and more than 10 checkbooks in other people's names. The scheme was so sophisticated that Bissoon even opened LLCs using the victims' PII and had dedicated cell phones labeled with victims' names, apparently to allow him to answer verification calls meant for the victims. To help him stay

organized, he also had Excel spreadsheets in which he kept track of the numerous accounts he had opened in victims' names. The large number of victims in this case, the high loss amount, and the many years during which Bissoon perpetrated the scheme all show that a lengthy sentence is necessary to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.

But Bissoon did not stop at what might be called "traditional" identity theft. When the COVID-19 pandemic struck, he saw an opportunity in the global crisis—and America's generous response to it. Using the same LLCs he had opened in victims' names, Bissoon applied for and received more than $1,000,000 in relief funds meant to help American businesses survive the pandemic. The fact that more than $1,000,000 that could have helped struggling Americans keep their businesses open, keep their jobs, and keep their homes instead went into Bissoon's pocket as spending money further supports the idea that a significant prison term is required to provide just punishment for the offense, as well as to send a strong message of deterrence to others who might be considering taking advantage of disaster-relief programs.

Also weighing in favor of a substantial term of imprisonment is the fact that Bissoon continued offending even after being charged in this case. During his interview with Pretrial Services, Bissoon lied about his financial condition, concealing some of his bank accounts. Then, after a magistrate judge ordered him released on conditions, he went right back to the scheme—asking a financial institution to make him "whole" by reimbursing him for $150,000 in allegedly unauthorized transfers that he himself had made. Bissoon's continued criminal conduct even after being charged and specifically ordered to refrain from reoffending shows

that he is at a high risk of recidivism. It also shows "aggravated criminal intent . . . [that] deserves additional punishment." Cmt. to § 2B1.1(b)(2).

Bissoon's history and characteristics do not offer significant mitigating circumstances. Unlike some defendants who come before the Court for sentencing, Bissoon was not raised by a single parent addicted to drugs; he did not grow up poor; he was not physically or verbally abused. Instead, Bissoon and his mother both reported that he was raised in a good home, and Bissoon even reported that the family "vacationed almost every summer and winter" and "traveled to England to visit family." (PSR ¶¶ 119, 127.) Although Bissoon dropped out of high school in the eleventh grade, a few years later he obtained his high school diploma and went on to obtain an associate degree in Architectural Engineering. (*Id.* ¶¶ 122, 135.) And for several years—from 2007 to 2011—Bissoon worked for British multinational infrastructure group Balfour Beatty, making $18.00 an hour. (*Id.* ¶ 139.) All of these facts suggest that Bissoon could have chosen a law-abiding career; he had the education and the family support to do so. But instead, Bissoon chose to engage in fraud—not because he was forced to, not because he had no other options, but apparently because that is what seemed easier. During the time that he was engaged in this fraud scheme—from at least 2013 through 2020—Bissoon does not appear to have had any legitimate employment at all; he appears to have supported himself entirely through the fraud, weighing in favor of a lengthy term of imprisonment. (*See* PSR ¶¶ 137, 139.)

In light of the foregoing facts, the government does not believe there are any factors justifying a below-Guidelines sentence. The government respectfully requests that the Court sentence Bissoon to a low-end sentence of 78 months on Count 1, followed by the mandatory consecutive 24-month sentence on Count 4. Because of the high risk that Bissoon will reoffend, the government also requests that the Court sentence him to two years' supervised release.

**C. The government requests that the Court also impose a substantial fine, order restitution to Barclays, and set a hearing to determine the restitution owed to the Small Business Administration.**

Restitution is another important component of any sentence for Bissoon—but, unfortunately, it has proven difficult to calculate the amounts owed to each victim. The financial institutions at which Bissoon opened accounts collectively lost millions of dollars to the scheme; however, because of the large number of accounts Bissoon created and the even larger number of transfers he made between those accounts, it has proven difficult to determine which banks suffered losses in which amounts. Although the government sent letters to the banks asking for documentation of losses, in most cases the letters went unanswered. The only exception was Barclays Bank DE, which provided proof of $3,591.32 that it wrote off from one of Bissoon's fraudulent accounts. (PSR ¶ 158.)

The individual victims—that is, those whose PII was stolen—were almost certainly harmed by Bissoon's unauthorized use of their credit, because he opened the accounts, made charges to them or requested advances from them, and then never repaid the money. But the government has been unable to find the victims to allow them to submit restitution requests, because Bissoon put fraudulent contact information on the many unauthorized accounts he opened in their names; this incorrect information is what now appears in relevant databases.

The government does not yet have, but anticipates receiving within the next week, evidence sufficient to show the amount of restitution owed to the Small Business Administration (SBA) relating to the COVID-19 disaster-relief loans that the government was not able to claw back from Bissoon. The government respectfully requests that, pursuant to 18 U.S.C. § 3664(d)(5), the Court set a date, no later than 90 days after sentencing, for a final determination of the amount of restitution owed to the SBA.

Because of the strong evidence that Bissoon profited greatly from his scheme (he appears to have earned no income from a legitimate job for approximately seven years), as well as the high likelihood that the government has not found all of the financial accounts in which Bissoon has ferreted away money (given that they were created in other people's names), a substantial fine would also be appropriate in this case. The Guidelines state that the Court should "impose a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine." U.S.S.G. § 5E1.2(a). And Bissoon is able to pay: The PSR's accounting of Bissoon's net worth shows that he has $192,800 in equity in a property on SE Shipping Road in Port St. Lucie, Florida, and that he and his two siblings jointly have $409,100 in equity in another residence on SE Elmhurst Road, also in Port St. Lucie. Although the PSR may have overstated Bissoon's net worth by attributing the total amount of equity in the SE Elmhurst Road property to Bissoon, even assuming that Bissoon holds just one-third of the equity in the Elmhurst property, he would have approximately $328,000 in assets, for a net worth (taking into account his $142,590 in debt) of approximately $186,000. Additionally, as the PSR notes, Bissoon will be able to participate in the Inmate Financial Responsibility Program while incarcerated, and a portion of his earnings can go toward a fine.

The Guidelines state that, in imposing a fine, one of the circumstances the Court should consider is "any restitution or reparation that the defendant has made or is obligated to make." U.S.S.G. § 5E1.2. Because Bissoon caused losses of at least multiple millions of dollars, and because the difficulty in calculating individual losses means he will not be obligated to pay restitution to the victim financial institutions (except Barclays) or the individual victims, it would be appropriate to impose a substantial fine. The government respectfully requests that

the Court impose a fine of $150,000. This amount is less than Bissoon's net worth and is substantially less than the high end of the Guidelines range for a fine, which here is $1,000,000; but it is still a substantial fine that would send a significant message of deterrence and disgorge some of Bissoon's ill-gotten gains.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court sentence Bissoon to 78 months on Count 1, followed by the mandatory consecutive 24-month sentence on Count 4; two years of supervised release; and a $200 special assessment. The government further requests that the Court impose a fine of $150,000, that Bissoon be ordered to pay $3,591.32 in restitution to Barclays Bank DE, and that the Court set another hearing for approximately 30 days from sentencing at which the amount of restitution due to the SBA may be determined.

Respectfully submitted,

KENNETH L. PARKER
United States Attorney

*s/Julie D. Garcia*______________
JULIE D. GARCIA (CA 288624)
Assistant United States Attorney
221 East Fourth Street, Suite 400
Cincinnati, Ohio 45202
Phone: (513) 684-3711